# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

BENJAMIN WELLS,

       Plaintiff,

v.                                   CV 11-272 WJ/WPL

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

Benjamin Wells filed an application for Supplemental Security Income benefits on December 10, 2007.[1] (Administrative Record ("AR") 118.) He alleges disability beginning September 1, 2005, due to Bipolar Disorder, post-traumatic stress disorder ("PTSD"), panic disorder, adult attention deficit disorder ("ADD"), arthralgia,[2] and headaches. (AR 13, 118, 149.) Administrative Law Judge ("ALJ") Ben Willard held a hearing on September 1, 2009. (AR 25-54.) On January 4, 2010, he determined that Wells was not under a disability as defined by the Social Security Act and was not entitled to benefits. (AR 11-20.) Wells filed an appeal with the Appeals Council, but on February 3, 2011, it declined Wells' request, making the ALJ's decision the final decision of the Social Security Administration ("SSA"). (AR 1.)

Wells sought review of the SSA's decision on March 30, 2011 (Doc. 1), and filed a Motion to Remand to Agency for Rehearing on August 5, 2011. (Doc. 10.) The Commissioner responded

---

[1]The ALJ writes that the application was filed on November 30, 2007; however, the Application Summary for Social Security Income states that he applied on December 10. (AR 11, 118.)

[2]Joint pain, not characterized by inflamation. *See* STEDMAN'S MEDICAL DICTIONARY 149 (27th ed. 2000).

(Doc. 20), and Wells filed a reply (Doc. 21). The Court referred the case to me for a recommendation on the ultimate disposition. (Doc. 23.) After having read and carefully considered the entire record, I recommend that the Court GRANT Wells' motion and remand the case for further proceedings consistent with this opinion.

## STANDARD OF REVIEW

In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted). A "decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* (quotation omitted). I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the Commissioner. *See id.* The ALJ's "failure to apply the correct legal standards, or to show us that she has done so, are also grounds for reversal." *Winfry v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996) (citing *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)).

## SEQUENTIAL EVALUATION PROCESS

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. § 416.920(a)(4). At the first three steps, the ALJ considers the claimant's current work activity and the medical severity of the claimant's impairments. *See* 20 C.F.R. § 416.920(a)(4). Before reaching step four, the ALJ determines the claimant's residual functional capacity ("RFC"). *See* 20 C.F.R. § 416.920(e). In the fourth step, the ALJ compares the claimant's RFC with the functional requirements of his past relevant work to see

if the claimant is still capable of performing his past work. *See* 20 C.F.R. § 416.920(f). If a claimant is not prevented from performing his past work, then he is not disabled. *Id.* If the claimant cannot return to his past work, then the Commissioner must show at the fifth step that the claimant is capable of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail). The claimant bears the burden of proof on the question of disability for the first four steps, and then the burden shifts to the Commissioner at step five. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Talbot v. Heckler*, 814 F.2d 1456, 1460 (10th Cir. 1987).

## FACTUAL BACKGROUND

Wells is a thirty-four year old man with a tenth grade education. (AR 29, 33, 154.) As a teenager, Wells was diagnosed with Bipolar Disorder. (AR 155.) In the summer of 2005, Wells was living in New Orleans when Hurricane Katrina hit, and, as a result, he claims that he suffers from flashbacks, nightmares, depression, and anxiety. (*Id.*) In 2006, Wells moved to Albuquerque and was homeless for a period of time, but he now lives in an apartment with a friend. (AR 149, 159.)

Wells has training as a baker, but his most recent employment has been as a security guard and a "bouncer" in bars. (AR 33-34, 150.) He stopped working in May 2007 due to the inability to handle the mental stress of work. (AR 149.) Although Wells alleges an onset date of September 5, 2005, the record contains medical evidence dating only as far back as 2006. On January 21, 2006, a police officer brought Wells to Lakeside Alternatives, Inc. ("Lakeside"), a rehabilitation facility in Florida, and he was voluntarily admitted. (AR 247.) He reported that he was off his Bipolar and ADD medications at the time. (*Id.*) Gerald J. Balsam, M.D., performed a psychiatric admission history and physical examination. (AR 247-51.) Wells tested positive for cocaine and had swelling

3

in his hip, but Dr. Balsam noticed no other physical abnormalities. (AR 248-49.) During the mental status examination, Dr. Balsam noted that Wells was alert and cooperative, his attention span and concentration were intact, and he was oriented to person, time, place and circumstances. (AR 250.) Dr. Balsam diagnosed him with "Bipolar I Disorder, Most Recent Episode Mixed, Severe Without Psychotic Features," but he wrote that he still needed to rule out a panic disorder and chronic PTSD. (AR 250-51.) Dr. Balsam assessed his Global Assessment of Functioning ("GAF") score at thirty-two upon intake. (AR 251.) When Wells was discharged from Lakeside on January 24, 2006, he had a GAF of fifty-eight, and his final diagnosis was that he had Bipolar I Disorder, ADD, and Polysubstance Abuse Disorder. (AR 244.) He was prescribed medications and referred to a medical clinic for counseling. (AR 246.)

   Wells returned to Lakeside for a follow-up appointment with Debra Ann Reinsmith Hargrove, A.P.R.N.,[3] on February 9, 2006. Wells reported that he was "going good," and Hargrove recorded that he had normal speech, good remote memory, his mood was congruent and euthymic, was adequately groomed, had congruent thought content, and had fair insight and judgment. (AR 241.) Hargrove assessed his GAF at fifty and refilled his prescriptions. (AR 242.)

   December 2007, Wells went to the University of New Mexico for help with his drug abuse. Peter Taylor, D.O., conducted the psychiatric evaluation, and he noted that Wells reported using crack cocaine several times a week. (AR 270.) Dr. Taylor assessed his GAF at sixty. (AR 271.)

   A few months later, in February 2008, Wells reappeared at the University of New Mexico, this time at the emergency care facility. (AR 260-64.) During intake, Wells told the nurse that he was not on his medications, feeling suicidal, and he did not feel it was "safe to be out in society."

_____

[3]Advanced Practice Registered Nurse

(AR 260, 262.) He also reported that he had resumed cocaine use. (AR 268.) He was again diagnosed with Polysubstance Abuse Disorder, in addition to depression, anxiety, and PTSD.[4] (AR 261.) While at the hospital, Jasen Andrew Christensen, D.O., completed a psychiatric pharmacological management evaluation. (AR 268-69.) Dr. Christensen opined that the core issue behind Wells' paranoia and agitated behavior was substance abuse. He assessed his GAF at forty-five. (AR 269.)

On April 9, 2008, Louis Wynne, Ph.D., performed a consultative examination of Wells. (AR 201-05.) He assessed Wells' GAF score at fifty and opined that he could read and understand basic written instructions and persist at simple tasks. (AR 204-05.) That same month, Scott Walker, M.D., performed a consultative mental RFC assessment. (AR 278-94.) Dr. Walker made similar findings, concluding that he could carry out detailed but simple instructions, make decisions, concentrate for two hours at a time, and interact appropriately with coworkers and supervisors. (AR 280.)

From March 2008 to March 2009, the staff at Heath Care for the Homeless ("HCH") treated Wells.[5] During this time, Emily Stafford, L.P.C.C.,[6] L.A.D.A.C.,[7] provided counseling for his PTSD and substance abuse issues. (AR 346.) Stafford performed a mental RFC assessment of Wells on December 30, 2008, and attached a letter describing her conclusions. (AR 343-46.) She opined that Wells had marked limitations in areas of memory, sustained concentration and persistence, and

[4]The diagnosis was made by an "Attending Physician," but the physician's name is undecipherable from the signature. (AR 261.)

[5]The record does not contain any treatment records from HCH prior to March 14, 2008; yet, according to their prescription log, HCH staff had been prescribing medication to Wells as early as October 13, 2006. (AR 355.)

[6]Licensed Professional Clinical Counselor

[7]Licensed Alcohol and Drug Abuse Counselor

5

adaptation, as well as moderate limitations in areas of social interaction. (AR 343-44.) In her explanatory letter, she stated that Wells "experiences heightened anxiety in work environments, due largely to PTSD symptoms." (AR 346.) She found that his focus and concentration were limited and that his anxiety would cause him to take frequent time off of work. (*Id*.) She also believed that Wells "presents as somewhat more functional than he probably is." (*Id*.)

Wells also received psychiatric care for his Bipolar Disorder from Tina Carlson, A.P.R.N., at HCH. (AR 306-314, 324-26, 331-33,338-40, 356-58.) During the year of treatment, Carlson regularly reported that Wells was doing well on his medication and was "feeling good" about his sobriety. (*Id*.) Matias Vega, M.D., a doctor at HCH, treated Wells' physical ailments and diagnosed him with gastroesophageal reflux disease ("GERD") (AR 335) and arthralgia (AR 328).

## HEARING TESTIMONY

The ALJ held a hearing on September 1, 2009, during which Wells and Vocational Expert ("VE") Pamela Bowman testified. (AR 25.) Wells was represented by counsel at the hearing. (*Id*.) Wells explained that he had been in New Orleans during Hurricane Katrina, and he was still dealing with a number of emotional issues related to the disaster. (AR 34, 35, 38, 45.) He described the stress and anxiety caused by performing simple tasks and being around other people, and he noted several times that it was difficult for him to bathe because he did not like the sensation of water on his skin. (AR 34-35, 37-38, 40, 45.) Wells testified that he was receiving treatment and counseling for his mental disorders as well as his substance abuse problem. (AR 41.) He claimed to have remained sober for a year and a half. (*Id*.) The ALJ also questioned Wells about his physical ailments, and Wells stated that he suffered from joint pain in his knees, hips, and hands and that the pain prevented him from walking long distances. (AR 38, 45-46.) While previously obese, he had lost approximately seventy pounds in early 2009, and he had been diagnosed with lupus. (AR 30,

349.) As of the date of the hearing, Wells had not yet taken steps toward treatment of his lupus, but he had plans to speak with his doctor about possible medications. (AR 30-31.)

The ALJ then questioned the VE about the claimant's ability to work. The ALJ first concluded that Wells had no past relevant work. (AR 49.) He then asked the VE whether there were jobs available in the national and regional economy that an individual of the claimant's age, educational, and work history, with no exertional limitations, but who was limited to simple, unskilled work involving primarily things rather than people, could perform. (*Id*.) The VE answered in the affirmative. (*Id*.) At the medium, unskilled level, an individual with those limitations could find a job as a warehouse worker, an odd job worker, or a salvage worker. (AR 50.) The ALJ then asked the VE to assume an individual who had an RFC for light work and with the same non-exertional limitations previously described. (*Id*.) The VE stated that such an individual could perform work as a cleaner or polisher, advertising material distributor, or laundry folder. (AR 50-51.)

### THE ALJ DECISION

The ALJ reviewed Wells' application for benefits according to the sequential evaluation process. At the first step, the ALJ found that Wells had not engaged in substantial gainful activity since November 30, 2007. (AR 13.) Then, at the second step, the ALJ concluded that he had the severe impairments of affective disorder and polysubstance abuse, but that his GERD, headaches, and arthralgia were not severe. (*Id*.) At step three, the ALJ found that his combination of severe impairments did not equal one of the listed impairments. (*Id*.) Wells had only mild restrictions in activities of daily living, moderate difficulties in social functioning, and one to two episodes of decompensation. (AR 14.) The ALJ then reviewed the medical evidence and determined that Wells could perform a full range of work at all exertional levels, but he was limited to simple job tasks and

working primarily with things rather than people. (AR 15.) Since the ALJ had found that Wells did not have past relevant work, he moved on to step five. (AR 17.) Citing the hearing testimony of the VE, the ALJ concluded that the claimant could perform work available in the national economy and was, therefore, not disabled under the meaning of the Social Security Act. (AR 18-19.)

DISCUSSION

Wells attacks the validity of the ALJ's RFC determination on two fronts: he claims that the ALJ's findings regarding both his non-exertional and exertional limitations are not supported by substantial evidence. I turn first to Wells's allegations regarding the non-exertional component of the RFC. Wells argues that the ALJ did not properly weigh the opinion of his treating mental health counselor, Emily Stafford, and that the remaining opinion evidence regarding his mental impairments did not support the ALJ's conclusions. I disagree.

The ALJ considered the opinion of Stafford and decided to give it less weight than the opinions of Dr. Wynne and Dr. Scott. (AR 17.) The ALJ explained that the record did not contain Stafford's treatment records or progress notes to support her conclusions. (AR 17.) Her opinion also conflicted with the progress and treatment notes from HCH, which the ALJ thought showed that Wells "does well so long as he is compliant with treatment." (*Id*.)

I find no error in the ALJ's treatment of Stafford's opinion primarily because Stafford is a certified counselor and not a treating physician as defined by the SSA. The SSA distinguishes between medical opinions from treating physicians and opinions from other sources. *See* SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Opinions from "acceptable medical sources," which include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech language therapists, are entitled to deference under the treating physician rule. *See* 20 C.F.R. § 416.913(a); *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir.

8

2004) (describing the ALJ's duties under the treating physician rule); *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003) (same); *Washington*, 37 F.3d at 1441 (holding that treating physicians are entitled more weight as a matter of law); *id*.

The SSA and the Tenth Circuit have recognized, though, that medical opinions from other sources should still be considered, especially if that source has treated the claimant more frequently than the "acceptable medical source." *See Frantz v. Astrue*, 509 F.3d 1299, 1302 (citing SSR 06-03p, at *5-6). These opinions may be used to show the severity of a claimant's impairments and their impact on his ability to work. *See id.* at 1301 (citing 20 C.F.R. § 404.1513(d)); *accord* 20 C.F.R. § 416.913(d). In evaluating the weight to assign to these opinions, the ALJ must support his decision with substantial evidence. *Strunk v. Barnhart*, 112 F. App'x 675, 677 (10th Cir. 2004) (unpublished) (upholding ALJ's decision to favor opinion of consultative psychiatrist over social worker who treated claimant for a year because it was supported by substantial evidence).

In this case, Stafford is the only treating mental health professional to provide an opinion regarding Wells' mental impairments. Consistent with the holdings of *Frantz* and *Strunk,* the ALJ clearly articulated that he was going to give Stafford less than controlling weight, and he provided an explanation in his determination for this decision. (AR 16-17.) Wells challenges the ALJ's reasoning as erroneous, arguing that his decision was based in part on an improper reliance on the absence of Stafford's treatment records. (Doc. 19 at 8; Doc. 21 at 4.) According to *Robinson v. Barnhart*, the ALJ must recontact a treating physician for additional evidence or clarification if the medical report does not contain all necessary information. 366 F.3d 1078, 1084 (10th Cir. 2004) (citing 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1)). "The responsibility to see that this duty is fulfilled belongs entirely to the ALJ," so the fact that Wells was represented by counsel does not override this duty. *Id.*

While it is clear that the ALJ erred in failing to recontact Stafford to ask for treatment records, this cannot warrant reversal as it is only harmless error. *See* 20 C.F.R. § 498.224 (harmless error not grounds for remand). In *Robinson*, the ALJ rejected the opinion of a treating physician solely because there was inadequate information, so the court remanded the case. 366 F.3d at 1084. Here, the ALJ proffered additional reasons for his decision, and he did not reject Stafford's opinion outright. In addition to the absence of supporting treatment records, the ALJ explained that Stafford's opinion was inconsistent with the reports of the other examiners, the HCH treatment records, and with Wells' testimony at the hearing. (AR 17.) As discussed below, all three of these reasons are supported by the record. In fact, they not only provide substantial evidence for the ALJ's decision to assign less weigh to Stafford but also substantial evidence for the ALJ's non-exertional RFC determination.

In considering the limitations caused by Wells' Bipolar Disorder, PTSD, and social anxiety, the ALJ began by observing that his "symptoms are well controlled when he is compliant with treatment and medications." (AR 16.) The ALJ noted that his periods of decompensation in January 2006 and February 2008 were both linked to noncompliance with his medications and substance abuse. (AR 16, 247, 269, 270-71. ) The ALJ then referred to the progress notes from Dr. Vega and Nurse Carlson at HCH to support the conclusion that Wells is functional when following his treatment regimen. (AR 16-17.) Wells argues that this is an incorrect interpretation of the notes. (Doc. 19 at 9.) However, a review of these notes reveal ample evidence to support the ALJ's decision. There are eleven progress notes from March 14, 2008, through March 2, 2009. Wells reported, and Carlson observed, on numerous occasions that Wells was doing well since he had become "clean." (AR 310, 313, 325, 332, 357.) Also, the notes regularly state that Wells' speech was within normal limits and that he had well-organized, linear, and logical thought processes. (AR

310, 313, 325, 332, 339, 357.) Furthermore, his judgement and insight were consistently described as either "good" (AR 307, 325, 332) or "fair" (AR 310, 313, 357), never "poor" or "bad."

The ALJ believed that these observations were strengthened by the opinions of the consultative physicians, Dr. Wynne and Dr. Walker. In his concluding remarks, Dr. Wynne stated that Wells "can read and understand basic written instructions and his concentration and ability to persist at simple work tasks is unimpaired." (AR 204.) Wells could interact appropriately with the general public and his coworkers, but he might have difficulty getting along with supervisors. (*Id.*) He could adapt to changes in the workplace, recognize hazards, and manage his own benefit payments. (*Id.*) Likewise, Dr. Walker opined that Wells could "understand, remember and carry out detailed but not complex instructions, make decisions, and attend and concentrate for two hours at a time, interact adequately with co-workers and supervisors and respond appropriately to changes in a work setting." (AR 280.) Both of these evaluations support the ALJ's non-exertional limitations.

Wells argues that the ALJ misconstrued Dr. Wynne's report. (Doc. 19 at 10.) He cites Dr. Wynne's statements that he had been sexually abused as a child and that during the interview Wells appeared depressed. (*Id.*) While both of these statements appear in the evaluation (*see* AR 201, 201), the ALJ's conclusions come directly from Dr. Wynne's final section, entitled "Summary and Clinical Impressions" (AR 204). I find the ALJ's use of the summary conclusions appropriate for two reasons. First, the courts cannot expect an ALJ to analyze and reference every element of a mental evaluation, especially when each evaluation is typically multiple pages in length, and there are generally several evaluations present in the record. *See generally Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996) (holding the ALJ must consider all of the evidence in the record, but nothing requires that he discuss every piece of evidence). Second, it is logical to assume that Dr. Wynne, in making his summary remarks, took into account Wells' mood and his family history.

11

Wells also claims that the ALJ's failure to discuss Dr. Wynne's GAF score was an error. (Doc. 19 at 10; Doc. 21 at 3.) However, as previously noted, the ALJ is not required to discuss every piece of evidence. Furthermore, "[b]y itself, a GAF score 'is not essential to the RFC's accuracy.'" *Atkinson v. Astrue*, 389 F. App'x 804, 808 (10th Cir. 2010) (unpublished) (quoting *Howard v. Comm'r of Soc. Sec.*, 276 F. 3d 235, 241 (6th Cir. 2002)). *See also Lopez v. Barnhart*, 78 F. App'x 675, 678 (10th Cir. 2007) (unpublished) (GAF scores "may indicate problems that do not necessarily relate to the ability to hold a job.").

Wells notes that Dr. Wynne stated that he "might" have difficulty with supervisors; yet, that portion of Dr. Wynne's findings were not included in the final non-exertional limitations. (Doc. 19 at 10.) While Wells believes that this omission amounts to legal error, I see no reason that the ALJ need adopt the speculations of an evaluator, even if that evaluator is granted controlling weight. Furthermore, Dr. Walker did not find such a limitation. (AR 280.)

Lastly, the ALJ relied on Wells' testimony that he regularly uses public transportation, "which requires him to be in close proximity to other passengers." (AR 17.) The ALJ interpreted his routine use of public transportation as an indication that he had only minimal functional restrictions. (*Id*.) Wells does not challenge this conclusion, and neither do I.

Wells' arguments regarding the non-exertional component of the RFC are unavailing. The ALJ's discussion of the available evidence regarding his non-exertional limitations is thorough, and his ultimate conclusions are supported by substantial evidence. However, I cannot say the same for the ALJ's discussion of Wells' exertional limitations. I turn now to the ALJ's decision that Wells is capable of performing at all exertional levels, and explain why the ALJ's analysis here warrants remand.

At step two, the ALJ had to consider whether any of Wells' impairments were "severe." *See*

12

20 C.F.R. § 416.920(c). At this step, he discussed Wells' GERD, headaches, and arthralgia, finding

that "[t]here is no evidence that the claimant continues to experience symptoms of GERD, or that

he has required additional treatment for body aches or headaches." (AR 13.) Accordingly, he found

that they were "not 'severe.'" (*Id.*) When it came time to determine Wells' RFC, though, the ALJ

failed to mention these three limitations.[8] This is an error since

> In assessing RFC, the adjudicator must consider limitations and restrictions imposed
> by all of an individual's impairments, even those that are not "severe." While a "not
> severe" impairment(s) standing alone may not significantly limit an individual's
> ability to do basic work activities, it may, when considered with limitations or
> restrictions due to other impairments – be critical to the outcome of the claim.

SSR 98-8p, at *5.

Presumably, the ALJ failed to discuss the impact of the limitations because he had previously

stated that "these conditions have all been addressed and treated with good results." (AR 13.) If this

was the case, then the failure to revive the discussion of the three impairments at the RFC stage

might only amount to harmless error, since a physical impairment that has been successfully treated

would ultimately have no real impact on Wells' exertional limitations. *See* 20 C.F.R. § 498.224.

However, the ALJ's assertion that all three ailments were under control is unsupported by

---

[8] While the ALJ must consider non-severe physical impairments when evaluating the claimant's RFC, he need not consider symptoms or combinations of symptoms. *See* SSR 96-4p, 1996 WL 374187, at *2 (July 2, 1996). A medically determinable physical impairment is "an impairment which has demonstrable anatomical, physiological or psychological abnormalities." *Id.* at *1. A symptom, on the other hand, is typically something like pain, fatigue, or nervousness. SSR 96-4P at *2. Thus, it is not clear that headaches and arthralgia would be considered physical impairments or merely symptoms. After all, both are simply terms for pain localized in a specific area (the head or joints). *See* STEDMAN'S MEDICAL DICTIONARY at 149, 789. If headaches and arthralgia are considered only symptoms, then the ALJ would have no duty to discuss them in his RFC determination. *Id.* While the ALJ does not explicitly call Wells' GERD, headaches, and arthralgia "physical impairments," he does characterizes them as "not 'severe'" under his step two discussion of the claimant's impairments. (AR 13.) Thus, I can infer that the ALJ did treat them as impairments and not symptoms. Further, the Commissioner did not raise the distinction between symptoms and impairments in his response brief. Since both the ALJ and the Commissioner have proceeded under the assumption that these ailments are "physical impairments," I shall do the same.

the facts. While Wells' medical records show that his GERD was under control, the record is silent as to the state of his headaches and arthralgia. (AR 349 (reporting no GERD symptoms while on Nexium).) In fact, the ALJ does not cite to a medical document to support this assertion, and neither does the Commissioner in his response brief. (AR at 13; Doc. 20 at 8.) Thus, the finding that Wells' headaches and arthralgia have been successfully treated is not supported by substantial evidence. Accordingly, I find that the ALJ's decision regarding the exertional component of Wells' RFC is erroneous and I recommend that the Court remand this case for proceedings consistent with this opinion.

Since I have found that Wells' challenge to the RFC determination warrants remand, I will not consider his additional arguments regarding the ALJ's step five decision or his credibility determination.[9]

CONCLUSION

The ALJ determined that Wells could perform at all exertional levels, but he made this finding without considering the impact of his physical impairments. This amounts to legal error. Accordingly, I recommend that the Court GRANT the motion to reverse the decision of the SSA and remand the case for proceedings consistent with this opinion.

---

[9]Wells also requested that the Court order the ALJ to rule upon his request to reopen (Doc. 19 at 15), but I will not consider this request. Wells explicitly notes that the denial of a request to reopen is not reviewable by the Court. (*Id.*) In fact, Wells cites *Califano v. Sanders*, which clarifies that the courts may only review the "final decision of the Secretary made after a hearing" and that a petition to reopen is not considered a final decision. 430 U.S. 99, 109 (1977).

**THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition. If no objections are filed, no appellate review will be allowed.**

William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any *pro se*
party as they are shown on the Court's docket.

15